# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| HEALTHCOR OFFSHORE MASTER FUND, L.P., | : | Case No.: _____ |
| c/o HealthCor Management, L.P. | : |  |
| 152 West 57th Street | : |  |
| New York, New York 10019 | : |  |
|  | : | **JURY TRIAL DEMANDED** |
| HEALTHCOR SANATATE OFFSHORE MASTER | : |  |
| FUND, L.P., | : |  |
| c/o HealthCor Management, L.P. | : |  |
| 152 West 57th Street | : |  |
| New York, New York 10019 | : |  |
|  | : |  |
| BLACKSTONE ALTERNATIVE MULTI- | : |  |
| STRATEGY FUND, | : |  |
| c/o HealthCor Management, L.P. | : |  |
| 152 West 57th Street | : |  |
| New York, New York 10019 | : |  |
|  | : |  |
| and BLACKSTONE ALTERNATIVE | : |  |
| INVESTMENT FUND PLC, | : |  |
| c/o HealthCor Management, L.P. | : |  |
| 152 West 57th Street | : |  |
| New York, New York 10019 | : |  |
|  | : |  |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| MALLINCKRODT PLC, | : |  |
| 675 McDonnell Blvd. | : |  |
| Hazelwood, MO 63042 | : |  |
|  | : |  |
| MARK TRUDEAU, | : |  |
| c/o Mallinckrodt PLC | : |  |
| 675 McDonnell Blvd. | : |  |
| Hazelwood, MO 63042 | : |  |
|  | : |  |
| and MATTHEW K. HARBAUGH, | : |  |
| 1106 Wheaton Hill Court | : |  |
| St. Louis, MO 63131 | : |  |
|  | : |  |

Defendants.                              :
                                         :
                                         :
-----------------------------------------------------------------x

## COMPLAINT AND JURY DEMAND

Plaintiffs HealthCor Offshore Master Fund, L.P., HealthCor Sanatate Offshore Master Fund, L.P., Blackstone Alternative Multi-Strategy Fund, and Blackstone Alternative Investment Fund PLC are investment funds that purchased the publicly listed and traded common stock of Mallinckrodt plc ("Mallinckrodt" or the "Company") and were damaged in connection therewith. Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, bring this action against Mallinckrodt and certain of its former and present officers, Mark Trudeau and Matthew K. Harbaugh (the "Individual Defendants" and collectively with Mallinckrodt, the "Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by its attorneys, which investigation includes, among other things, a review and analysis of: Mallinckrodt's filings with the United States Securities and Exchange Commission ("SEC"); Mallinckrodt's press releases and public statements; transcripts of Mallinckrodt's investor calls and earnings calls; media and analyst reports involving Defendants; investor presentations drafted by Mallinckrodt; pleadings, motion papers, and exhibits to declarations filed in the matter *Shenk, et al., v. Mallinckrodt plc, et al.*, No. 17-cv-00145 (DLF) (D.D.C.) (the "Class Action"); and other publicly available documents and data concerning Mallinckrodt.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody

and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

I.    **NATURE OF THE ACTION**

1.     This is an action to recover significant investment losses suffered as a result of numerous false and misleading statements made by Mallinckrodt and its senior executives about its key drug, H.P. Acthar Gel ("Acthar").  Acthar is an injectable medication designed to treat several debilitating conditions, including infantile spasms, multiple sclerosis, and other difficult-to-treat autoimmune and inflammatory disorders.  In 2015, Defendants lied to investors about the amount of Mallinckrodt's Acthar revenue that was generated by sales to Medicare and Medicaid patients.  Then, in 2017, Defendants further misled investors about the extent to which private insurers were providing coverage for Acthar.  When the truth about Acthar was revealed, Mallinckrodt's stock price plummeted.

2.     During the relevant period, but unbeknownst to investors, a significant portion of Mallinckrodt's sales of Acthar were funded by government-sponsored healthcare plans rather than by private insurers and commercial payers.  The percentage of Acthar sales reimbursed by Medicare and Medicaid compared to sales by private insurers was highly material information to investors such as Plaintiffs.  Medicare and Medicaid generally pay lower prices for healthcare than private insurers.  Moreover, drugs that are sold to Medicare and Medicaid patients are subject to greater regulatory scrutiny from policymakers.

3.     On October 6, 2015, Defendant Trudeau was asked directly by an investment analyst about Acthar's exposure to Medicare reimbursement.  Rather than tell the truth – that the percentage of Acthar sales reimbursed by Medicare and Medicaid was over 60% in 2014 and over 61% in 2015 – Trudeau significantly and materially understated that exposure.  Specifically, Trudeau misrepresented that the Company's combined revenues from Medicare and Medicaid

attributable to Acthar were "maybe a little higher" than the roughly 25% of Mallinckrodt's total business that flowed through those programs. This misrepresentation caused Mallinckrodt's common stock to trade at artificially inflated prices. Had investors known that Acthar's Medicare and Medicaid exposure was significantly higher – more than double the 25% number that Trudeau floated, the stock would have traded at materially lower prices.

4.      Acthar's actual exposure to Medicare and Medicaid was not revealed to the market until late 2016. In response to growing political pressure to tackle price gouging in the pharmaceutical industry, the Centers for Medicare and Medicaid Services ("CMS") publicly released data about the amount of Medicare and Medicaid funds that were being spent on certain drugs. In November 2016, a stock market analyst compared the newly released CMS data concerning Acthar to Trudeau's October 2015 statement, and found that Defendants had significantly and materially understated Acthar's Medicare and Medicaid exposure. When the stock analyst released a report summarizing his results, the price of Mallinckrodt's stock tumbled.

5.      However, Defendants' misrepresentations concerning Acthar were not limited to the drug's exposure to Medicare and Medicaid. Indeed, after the Medicare/Medicaid issue came to light, Defendants concealed from the market issues relating to the limited duration and number of conditions for which private insurance companies were willing to provide insurance coverage for Acthar, and the impact of those coverage limitations issues on Acthar's sales growth.

6.      In 2017, Defendants represented that Acthar was achieving growth across the payer mix and strengthening its formulary positions, and as a result Mallinckrodt was maintaining its sales guidance of mid-single-digit to low-double-digit growth for Acthar. These statements conveyed to the market that major private insurers were expanding reimbursements for most of Acthar's treatments. However, that simply was not true. In fact, private insurers were actually

cutting back on Acthar reimbursements, including approving Acthar for a limited range of treatments only and placing severe restrictions on the duration of Acthar treatments.

7.     Like the Medicare/Medicaid misrepresentation, Defendants' material misrepresentations and omissions concerning Acthar's sales growth artificially inflated the price of Mallinckrodt common stock.  The truth about Acthar's sales growth was partially revealed in November 2017, when Mallinckrodt reported that its sales of Acthar had actually declined.  This revelation again caused the price of Mallinckrodt's common stock to fall.

8.     Plaintiffs are investment funds that purchased significant amounts of Mallinckrodt common stock in the United States between January 2016 and November 2017, during the time when Defendants, unbeknownst to the investing public, were making false and/or fraudulent statements about Acthar.  As a series of partial but inadequate disclosures about Acthar were released to the market, causing the price of Mallinckrodt common stock to plummet, Plaintiffs suffered significant losses.

9.     Plaintiffs now bring this action to recover the damages suffered as a result of Defendants' materially false and misleading misstatements and omissions.

## II.    <u>JURISDICTION AND VENUE</u>

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

13.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## III.     PARTIES

### A.     Plaintiffs

14.     Plaintiff HealthCor Offshore Master Fund, L.P. is a Cayman Islands exempted company whose investment adviser has its main office in New York, New York.  A list of the dates on which it purchased Mallinckrodt common stock during the relevant period is attached hereto as Exhibit A.

15.     Plaintiff HealthCor Sanatate Offshore Master Fund, L.P. is a Cayman Islands exempted company whose investment adviser has its main office in New York, New York.  A list of the dates on which it purchased Mallinckrodt common stock during the relevant period is attached hereto as Exhibit B.

16.     Plaintiff Blackstone Alternative Multi-Strategy Fund is a Massachusetts business trust whose investment subadviser has its main office in New York, New York.  A list of the dates on which it purchased Mallinckrodt common stock during the relevant period is attached hereto as Exhibit C.

17.     Plaintiff Blackstone Alternative Investment Fund PLC is an Irish-domiciled UCITS whose investment subadviser has its main office in New York, New York.  A list of the dates on

which it purchased Mallinckrodt common stock during the relevant period is attached hereto as Exhibit D.

18.     At all relevant times, HealthCor Management, L.P. ("HealthCor") acted as investment adviser or as investment subadviser to Plaintiffs in connection with their purchases of Mallinckrodt common stock.

### B.     Defendants

19.     Defendant Mallinckrodt is an Irish corporation with its corporate headquarters in Staines-upon-Thames, England.  Mallinckrodt has maintained its operational headquarters near St. Louis, Missouri since its founding in 1867.  Mallinckrodt describes itself in its SEC filings as a "global business that develops, manufactures, markets and distributes branded and generic specialty pharmaceutical products and therapies."  Mallinckrodt's common stock is publicly traded in the United States on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK." Mallinckrodt files documents with the SEC in this District.

20.     Defendant Mark Trudeau ("Trudeau") is Mallinckrodt's Chief Executive Officer ("CEO"), President of Mallinckrodt, a member of the management executive committee, and a member of the Company's Board of Directors ("Board").  In anticipation of the spin-off of Mallinckrodt from Covidien plc ("Covidien"), Trudeau joined Covidien plc in February 2012 as a Senior Vice President and President of its Pharmaceuticals business.  Trudeau became CEO of Mallinckrodt in June 2013, when Mallinckrodt became an independent public company. Throughout the relevant period, Trudeau signed each of the Company's Forms 10-K filed with the SEC in Washington, D.C.  He also signed the certifications required by the Sarbanes-Oxley Act of 2002 ("SOX") with each of the Forms 10-K and Forms 10-Q that Mallinckrodt filed with the SEC in Washington, D.C. during the relevant period.

21. Defendant Matthew K. Harbaugh ("Harbaugh") was the Vice President and Chief Financial Officer of Mallinckrodt during the relevant period.  Harbaugh resigned from the Company, effective September 6, 2019.  Harbaugh served as Mallinckrodt's CFO for more than five years.  Prior to Mallinckrodt's spin-off from Covidien plc in July 2013, Harbaugh served in several finance and leadership roles at Covidien for nearly six years, including as CFO and interim president of Covidien's Pharmaceuticals business.  Throughout the relevant period, Harbaugh signed each of the Forms 10-K and Forms 10-Q and certain of the Forms 8-K filed with the SEC in Washington, D.C.  He also signed the SOX certifications with each of the Forms 10-K and the Forms 10-Q that Mallinckrodt filed with the SEC in Washington, D.C. during the relevant period.

22.     Because of Defendants Trudeau's and Harbaugh's high-ranking positions and direct involvement in the everyday business of Mallinckrodt and its subsidiaries, they directly participated in the management of Mallinckrodt's operations, including its public reporting functions, had the ability to, and did control, Mallinckrodt's conduct, and were privy to confidential information concerning Mallinckrodt and its business, operations, and financial statements.

## IV.  FACTUAL ALLEGATIONS

### A.  Mallinckrodt and Acthar

23.     Mallinckrodt is a specialty pharmaceutical company that develops, manufactures, markets and distributes branded and generic pharmaceutical products and therapies worldwide. Mallinckrodt became a public company in July 1, 2013, after it was spun-off from Covidien.

24.     One of Mallinckrodt's primary products is H.P. Acthar Gel ("Acthar").  Acthar accounted for over $1 billion of Mallinckrodt's net sales and represented about 34% to 37% of Mallinckrodt's total net sales from 2015 to 2017.

25.     Acthar is an injected medication used to treat many serious conditions, including infantile spasms and a variety of autoimmune and inflammatory diseases.  Infantile spasms are a

rare form of epilepsy that affect around 2,500 infants and children in the United States per year. If not treated, infantile spasms can result in infant death.

26.     Acthar has been described as a rare drug, as it is prescribed by less than 1% of doctors, and is typically used as a last resort treatment in adults, after other treatments have failed.

27.     While the FDA approved Acthar for 19 different diseases or conditions, the Company had indicated it was marketing Acthar for the following 9 indications during the relevant time period:

- **Neurology**
  - o  Infantile Spasms
  - o  Multiple sclerosis flares in adults

- **Rheumatology**
  - o  Multiple organs (including muscle and joint): Lupus
  - o  Dermatomyositis/polymyositis
  - o  Rheumatoid arthritis flares
  - o  Psoriatic arthritis flares
  - o  Ankylosing spondylitis flares

- **Pulmonology**
  - o  Symptomatic sarcoidosis

- **Nephrology**
  - o  Edematous state (remission of proteinuria in nephrotic syndrome)

28.     According to a Mallinckrodt Investor Briefing Presentation, dated December 7, 2015, Acthar had "low patient penetration across majority of approved indications," as depicted below:



29.     The active ingredient of Acthar, adrenocorticotrophic hormone (ACTH), is extracted from the pituitary glands of slaughtered pigs and then mixed with gelatin (another animal byproduct).

30.     Acthar works by stimulating the outer layer of cells of the adrenal gland, promoting the production of natural hormones that reduce inflammation.  Once injected, it is absorbed into the bloodstream and, upon reaching the adrenal gland, steroid hormones (largely cortisol) are produced.

31.     Prescription drugs in the United States are regulated by the Food and Drug Administration ("FDA").  Acthar was approved by the FDA in 1952.  At that time,  it was manufactured by a division of Armour & Company, a meatpacking business.  Back then, an applicant seeking approval of a new drug was required to show only that it was safe, and not that it was also effective for its prescribed uses.  While the law has since changed, drugs like Acthar that were approved prior to the change in the law were grandfathered in.

32.     Beginning in 1958, doctors began using Acthar off-label (uses not approved by the FDA) to treat infantile spasms.

33.     In 1999, the French chemical and pharmaceutical company, Rhone-Poulenc Rorer, which then became Aventis Pharmaceuticals, Inc. ("Aventis"), obtained the rights to Acthar.

34.     In July 2001, Questcor Pharmaceuticals, Inc. ("Questcor") acquired the rights to Acthar from Aventis for the paltry sum of $100,000 (plus modest royalties).  At that time, Acthar was sold for $40 per vial.

35.     Questcor sought to expand the uses for which Acthar could be prescribed in the United States.  In October 2010, the FDA approved a supplemental new drug application for Acthar for the treatment of infantile spasms.  The FDA also approved a revised label for the drug that included 19 different medical conditions and eliminated approximately 30 others.  According to an October 15, 2010 Questcor release, the 19 indications were organized under the following diseases:

> **Infantile Spasms**: H.P. Acthar Gel (repository corticotropin injection) is indicated as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age.
>
> **Multiple Sclerosis**: H.P. Acthar Gel (repository corticotropin injection) is indicated for the treatment of acute exacerbations of multiple sclerosis in adults. Controlled clinical trials have shown H.P. Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis. However, there is no evidence that it affects the ultimate outcome or natural history of the disease.
>
> **Edematous State**: To induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.
>
> **Rheumatic Disorders**: As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in Psoriatic arthritis, Rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy), Ankylosing spondylitis.

**Collagen Diseases**: During an exacerbation or as maintenance therapy in selected cases of: systemic lupus erythematosus, systemic dermatomyositis (polymyositis).

**Dermatologic Diseases**: Severe erythema multiforme, Stevens-Johnson syndrome.

**Allergic States**: Serum sickness.

**Ophthalmic Diseases**: Severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as: keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis; optic neuritis; chorioretinitis; anterior segment inflammation.

**Respiratory Diseases**: Symptomatic sarcoidosis.

**Multiple Sclerosis**: H.P. Acthar Gel (repository corticotropin injection) is indicated for the treatment of acute exacerbations of multiple sclerosis in adults. Controlled clinical trials have shown H.P. Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis. However, there is no evidence that it affects the ultimate outcome or natural history of the disease.

**Edematous State**: To induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.

**Rheumatic Disorders**: As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in Psoriatic arthritis, Rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy), Ankylosing spondylitis.

**Collagen Diseases**: During an exacerbation or as maintenance therapy in selected cases of: systemic lupus erythematosus, systemic dermatomyositis (polymyositis).

**Dermatologic Diseases**: Severe erythema multiforme, Stevens-Johnson syndrome.

**Allergic States**: Serum sickness.

**Ophthalmic Diseases**: Severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as: keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis; optic neuritis; chorioretinitis; anterior segment inflammation.

**Respiratory Diseases**: Symptomatic sarcoidosis.

36.     The Questcor 2013 annual report provided the following background concerning the development of Acthar, its approval for nineteen different treatments in the United States, and the testing that had and had not been required to obtain FDA approval for Acthar's use in humans:

> Acthar was originally approved by the FDA in 1952, for the treatment of approximately 50 different medical conditions, or "indications."  This was prior to the enactment of the 1962 Kefauver Harris Amendment, or the "Drug Efficacy Amendment," to the Food, Drug, and Cosmetic Act, which introduced the requirement that drug manufacturers provide proof of the effectiveness (in addition to the previously required proof of safety) of their drugs before approval.  As such, the FDA's original approval in 1952 was based on safety; clinical trials evaluating efficacy were not required. In the 1970s the FDA reviewed the safety and efficacy of Acthar during its approval of Acthar for the treatment of acute exacerbations in Multiple Sclerosis (MS) and evaluated all other previous indications on the label through the process called DESI – Drug Efficacy Study Implementation.  In this process the medical and scientific merits of the label and each indication on the label were evaluated based on publications, information from sponsors, and the judgment of the FDA. The label obtained after the DESI review and the addition of the MS indication is the Acthar label that was used until the most recent changes in 2010.
>
> In 2010, in connection with its review of our supplemental New Drug Application, or sNDA, the FDA again reviewed evidence of safety and efficacy, added the treatment of Infantile Spasms (IS) to the label of approved indications, and maintained its approval of Acthar for the treatment of acute exacerbations in MS and 17 other indications, including proteinuria in the Nephrotic Syndrome without uremia of the idiopathic type or that due to lupus erythematosus, certain rheumatology-related indications and respiratory manifestations of symptomatic sarcoidosis. In conjunction with its decision to retain these indications on a modernized Acthar label, the FDA eliminated approximately 30 indications from the label.  The FDA review included a medical and scientific review of Acthar and each indication (for example, an evaluation of the pathophysiology associated with each indication and the known and potential mechanism of action of Acthar for each indication) and an evaluation of available clinical and non-clinical literature that had become available through the date of the review.

The FDA did not require us to perform additional clinical trials for Acthar.

37.     After its acquisition of Acthar, Questcor started dramatically increasing its price. The price in 2001 was $40 per vial.  By 2006, Questcor had raised the price to $1,650 per vial. Within a year, Questcor increased the price to more than $23,000 per vial.  By 2012, Questcor had raised that price to $28,000 per vial.  As a result of Questcor's efforts, Questcor's sales of Acthar increased from just $9 million in 2002 to a whopping $761.3 million in 2013.

38.     In August 2014, Mallinckrodt acquired Questcor for $5.6 billion in cash and shares of the Company's common stock.  At that time, over 95% of Questcor's $789.9 million in revenue came from Acthar.

39.     Since its acquisition from Questcor in 2014, Mallinckrodt has continued to raise the price of Acthar, and by 2017, Mallinckrodt was charging more than $36,000 per course of treatment.

40.     Acthar constitutes a significant part of Mallinckrodt's business.  According to Mallinckrodt's filings with the SEC, Acthar accounted for a substantial percentage of Mallinckrodt's net sales during the relevant period:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| Acthar Net Sales | 1,037,300,000 | 1,160,400,00 | 1,195,100,000 |
| Percentage of Net Sales to Total Net Sales | *35%* | *34%* | *37%* |

41.     Indeed, in Mallinckrodt's 2014 annual report, filed on Form 10-K with the SEC, Mallinckrodt stated that "following our acquisitions of Cadence and Questcor, both of which were completed in fiscal 2014, we expect that a small number of products, most notably Acthar and to a lesser extent, Ofirmev, will represent a significant percentage of our net sales."

B.     **Acthar's Medicare and Medicaid Exposure**

42.     During the relevant period, but unbeknownst to investors at the time, a significant portion of Mallinckrodt's sales of Acthar were funded by Medicare and Medicaid.

43.     Medicaid is a joint federal-state program that provides healthcare services and prescription drug coverage to low-income Americans.

44.     Medicaid is funded by U.S. taxpayers.  Medicaid accounted for approximately 17% of all U.S. healthcare expenditure in 2016.  More than 70 million people were covered by Medicaid in 2016, including over 30 million children.

45.     There are strict minimum eligibility requirements for Medicaid set by federal and state law.  For instance, pregnant women and children only qualify if their families earn less than 133% of the federal poverty line, which in 2015, was defined as $32,252.50 for a family of four.

46.     Medicare is a federal government assistance program that provides healthcare services and prescription drug coverage to people who are 65 or older, certain younger people with disabilities, and people with end-stage renal disease (permanent kidney failure requiring dialysis or a transplant).

47.     Like Medicaid, Medicare is funded by U.S. taxpayers.  Medicare accounted for approximately 20% of all U.S. healthcare expenditure in 2016.  Approximately 55.3 million people were covered by Medicare in 2016.

48.     In the joint proxy statement filed in connection with the Questcor and Mallinckrodt merger on July 2014, Mallinckrodt identified as a risk factor the percentage of Acthar sales reimbursed by Medicare and Medicaid rather than by private insurers, although they did not disclose what percentage of Acthar sales were tied to government healthcare programs.  The joint proxy statement stated there were "risks and uncertainties" related to *inter alia* "an increase in the

proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible patients and government entities."

49.     Indeed, there are several risks associated with relying on Medicare and Medicaid reimbursements compared to reimbursements by private insurers. *First*, on a per enrollee basis, private insurance spending has grown much faster than Medicare and Medicaid spending because, generally speaking, private insurance pays higher prices for healthcare than Medicare and Medicaid, as reflected in the following chart: [1]



**On a per enrollee basis, private insurance spending has grown much faster than Medicare and Medicaid spending**

Cumulative growth in per enrollee spending by private insurance, Medicare, and Medicaid, 2008 - 2018

Source: Source: KFF analysis of CMS National Health Expenditures Accounts • Get the data • PNG

Peterson-KFF
**Health System Tracker**

50.     *Second*, in the pharmaceutical industry, a high level of dependency on Medicare and Medicaid reimbursements exposes significant revenue streams to federal and state policy shifts, including those targeting pharmaceutical prices.

51.     In 2015, in particular, there was growing controversy over the rising prices of pharmaceuticals. The issue of increasing drug prices became the focus of Congressional hearings

---

[1] *See* Rabah Kamal, Daniel McDermott et al., "How Has U.S. Spending on Healthcare Changed Over Time?," KAISER FAMILY FOUNDATION (Dec. 20, 2019).

and a hot topic on the presidential campaign trail.  For example, in November 2015, U.S. Senators Susan Collins and Claire McCaskill launched an investigation into companies that bought medicines and then raised prices to previously unforeseen levels.

52.     On December 9, 2015, the Senate Special Committee on Aging commenced its public hearings on drug prices to examine the huge spikes in drug prices.  At the same time, several House of Representative members formed the Affordable Drug Pricing Taskforce to examine drug pricing.

53.     Due to the rise of prescription drug prices and also expenditures to government healthcare programs, the federal agencies charged with administering Medicaid and Medicare faced growing pressures to control spending.

54.     On December 14, 2015, the Congressional Research Service published a report, titled "Medicaid Financing and Expenditures" and found that "federal Medicaid expenditures are expected to increase significantly over the next ten years due to the ACA [Affordable Care Act] Medicaid expansion.  As a result, Medicaid could be a focus of any potential deficit reduction or other legislative proposals affecting the federal budget."

55.     Indeed, both the House and Senate budgets for FY2016 included proposals to reform Medicaid financing, such as converting Medicaid to a block grant and capping allotment.

56.     The majority of states also identified high-cost and specialty drugs as a significant cost-driver for state Medicaid programs and "[o]ver two-thirds of the states in FY 2015 and half in FY 2016 reported actions to refine and enhance their pharmacy programs in response to new and emerging specialty and high-cost drug therapies."[2]

---

[2] *See* Vernon K. Smith, Kathleen Gifford et al., "Medicaid Reforms to Expand Coverage, Control Costs and Improve Care: Results from a 50-State Medicaid Budget Survey for State Fiscal Years 2015 and 2016," KAISER FAMILY FOUNDATION (Oct. 15, 2015).

57.     Like Medicaid, Medicare also faced pressures from media outlets and policymakers to control costs.  On September 22, 2015, Rafi Mohammed, an economist on pricing issues wrote in the *Harvard Business Review*:

> There's no mystery why prescription drug prices are higher in the U.S.: virtually every country regulates prices and the U.S. doesn't. ***In fact, Congress has explicitly prohibited Medicare from negotiating drug prices with pharmaceutical companies.*** (Close to 40 million people in the U.S. have this prescription drug benefit). Prices in Norway, the fourth wealthiest country in the world (U.S. is number 6), for instance, are amongst the lowest in Western Europe. The bottom line: most countries play hardball on drug prices, while the U.S. pays retail. As a result, consumers in the U.S. are stuck footing most of the bill for developing new drugs, even as consumers throughout the developed world reap the benefits.[3]

58.     Shortly thereafter, 2016 Democratic Presidential Candidate Hillary Rodham Clinton detailed her proposal to lower prescription drug costs, which included, among other things, allowing Medicare to negotiate drug prices with pharmaceutical companies directly.

59.     In December 2015, as part of its effort "to provide additional information, increase transparency, and address the affordability of prescription drugs," the Centers for Medicare & Medicaid ("CMS") announced it was launching a new online dashboard to look at a select number of high cost Medicare prescription drugs.  As stated on the CMS website: "The 2015 Medicare Drug Spending Dashboard is an online interactive tool that presents drug spending and utilization information on certain Medicare Part B drugs (drugs administered in doctors' offices and other outpatient settings) and Medicare Part D drugs (drugs patients generally administer themselves)."

60.     For the Dashboard, CMS identified 80 drugs using 2015 data that met certain criteria:  40 drugs provided through the Medicare Prescription Drug Program under Part D and 40

---

[3] Unless otherwise indicated, bold and italic emphasis used in quotations throughout this Complaint has been added and did not appear in the original quotation.

drugs administered by physicians and other professionals in the Medicare fee-for-service program under Part B. The following criteria was used to select the drugs: the drug is ranked in the top 15 in terms of total program spending (for either Part B or D); the drug is associated with a high annual per user spending based on claims data analyses (i.e., greater than $10,000 per user) and is ranked in the top 15 by overall program spending (and not already selected by the prior criterion); or the drug is ranked among the top 10 high unit cost increases (and not already selected by the either of the prior two criteria).

61.     Acthar was one of the products that met the CMS's criteria and was included in the study.

62.     However, the CMS data from this initiative was not actually publicly released until November 14, 2016.

**C.     Acthar's Long-Term Growth Prospects**

63.     As Mallinckrodt stated in its 2014 annual report, filed on Form 10-K with the SEC, Mallinckrodt's ability to increase net sales from Acthar depended on its "ability to achieve hospital formulary acceptance, and maintain reimbursement levels by third-party payors."

64.     When Mallinckrodt acquired Questcor in 2014, Mallinckrodt recognized that "a number of payers [] had made some restrictions to their formularies regarding Acthar before [Mallinckrodt] took possession of the drug," as Defendant Trudeau explained on a February 7, 2017 earnings call.

65.     Thus, shortly after Mallinckrodt acquired Questcor, the Company began a project that had a "long-term objective" to bring "the majority of 'covered lives' under contract," *i.e.*, expand its payer positioning with private insurers.

66.     In the Company's earnings call of February 2, 2016, Defendant Trudeau stated:

Acthar commercial coverage stands at about a third of the total eligible US patient population under contract with key payors and we continue to focus on expanding coverage with other major payors.

Looking to the remainder of fiscal 2016 and beyond, we continue to be comfortable with our ability to grow Acthar sales volume in key indications through focused activities like these.

67.     During the earnings call of August 2, 2016, Trudeau again addressed this "long-term objective" and stated that "over the course of the last two years or so, we have moved that [the proportion of covered lives under contract for Acthar] from zero to now greater than 50%."

68.     Heading into 2017, Trudeau sought to further assure analysts and investors that the Company was moving in a positive direction to obtain significant increases in reimbursement payments for Acthar from private insurers.

**D.     Mallinckrodt's Reporting Obligations as a Public Company**

69.     Under the federal securities laws and the regulations and guidance promulgated by the SEC pursuant to those laws, companies whose stock is publicly traded in the U.S. – such as Mallinckrodt – have important reporting and disclosure obligations.

70.     Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and their financial condition.  Investors rely on the accuracy and transparency of these disclosures when determining whether to invest.

71.     Throughout the relevant period, Trudeau signed each of the Forms 10-K publicly issued by the Company and filed with the SEC in Washington, D.C., and regularly participated on the Company's quarterly earnings calls and in other investor or analyst presentations.

72.     Throughout the relevant period, Harbaugh signed each of the Forms 10-K and 10-Q publicly issued by the Company and filed with the SEC in Washington, D.C., and regularly

participated on the Company's quarterly earnings calls and in other investor or analyst presentations.

73.     Throughout the relevant period, Harbaugh also signed each of the Forms 8-K publicly issued by the Company and filed with the SEC in Washington, D.C. regarding the Company's results of operation and financial condition, which included as exhibits thereto Mallinckrodt's press releases announcing earnings results.

74.     In addition to the affirmative disclosure obligations required by the SEC, federal law prohibits a person from making a materially false or misleading statement in connection with the purchase or sale of a security.  Moreover, when a company makes an incomplete statement that omits material information necessary to render the affirmative statement not misleading, that statement can be considered a violation of the federal securities laws even if the company did not have an independent duty to disclose the omitted information in the absence of the affirmative statement.  These principles apply not only to Mallinckrodt's filings with the SEC, but also to its other public statements made to investors, including on earnings calls and in investor presentations.

75.     As a publicly traded corporation with significant operations in the U.S., Mallinckrodt is required to prepare its financial statements in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP") in order for those financial statements not to be deemed misleading and inaccurate.  U.S. GAAP is a set of rules and standards that are designed to ensure uniform financial reporting.

76.     In addition to complying with U.S. GAAP, public companies are required to follow the standards developed by the SEC governing what information must be disclosed in financial statements and other public filings.

77.     As explained in greater detail below, unbeknownst to the market, between 2015 and 2017, Defendants made material misrepresentations and failed to disclose material information that they had a duty to disclose, in order to artificially inflate the price of Mallinckrodt's common stock.  Defendants did this by: (1) lying to the investing public about Acthar's exposure to Medicare and Medicaid; and (2) misleading investors about the long-term prospects for Acthar's sales as they relate to Acthar's growth across the payer mix, strengthened formulary positions and the removal or relaxation of formulary restrictions, and specific growth projections.

E.  **Mallinckrodt Misleads Investors about Acthar**

1.  **Mallinckrodt's Misrepresentations about Acthar's Exposure to Medicare and Medicaid**

78.     Unbeknownst to the investing public, Mallinckrodt blatantly lied about Acthar's exposure to Medicare and Medicaid reimbursements by intentionally presenting false data in October 2015 that Acthar was not as dependent on reimbursements from these programs as it actually was.

79.     On October 6, 2015, Mallinckrodt held an "update investor call," during which Defendants Trudeau and Harbaugh, as well as Chief Scientific Officer ("CSO") Dr. Steven Romano and Senior Vice President of Investor Strategy Cole Lannum spoke and responded to questions.

80.     Acthar was a significant point of focus on the call and was mentioned a total of 74 times.

81.     Indeed, Defendant Harbaugh emphasized that:

> [w]hen we evaluated the acquisition of Acthar, we dug deeply into the product, the market, existing therapies, and the potential for additional competition. We concluded then that Acthar was a unique asset with significant durability, and great potential for substantial long-term volume growth, and we continue to believe that now.

82.     During the Q&A session of the call, an analyst then asked, "What is [Mallinckrodt's] Acthar exposure to Medicare?"

83.     In response, Trudeau stated, "the combined proportion of [Mallinckrodt's] business that goes through Medicare and Medicaid combined it's about a quarter of our business, roughly" and "***Acthar is maybe a little bit higher than that***.  But in general, our business is about a quarter."

84.     Trudeau had absolutely no basis for representing that the proportion of Acthar's revenues attributable to Medicare and Medicaid represented about 25% of the business or "maybe a little bit higher than that."  Indeed, this statement understated Acthar's combined Medicaid and Medicare exposure by more than half the true amount, at best.

85.     Acthar's actual exposure to Medicare and Medicaid was highly material, as Acthar was Mallinckrodt's "largest single product," and having more government reimbursements compared to private insurer reimbursements presented a significant risk to the Company's business and future prospects.

86.     The question about Acthar's Medicare and Medicaid exposure on the October 2015 investor call was also one that was readily anticipated and the underlying facts known or were readily available to Defendants on the call and/or shortly thereafter.

87.     And yet after the investor call, Defendants continued to conceal Acthar's actual exposure to Medicare and Medicaid reimbursements, and failed to correct Defendant Trudeau's false and misleading statement for more than thirteen months.

88.     By the spring of 2016, Andrew Left, an activist short seller, author and editor of the online investment newsletter Citron Research ("Citron"), began to investigate the true extent of Mallinckrodt's reliance on Medicare and Medicaid programs.

89.     Although not known to investors at the time, according to CMS, the Medicare Part

D spending on Acthar from 2011 to 2015 was as follows:

| 2011 | H.P. Acthar | $49,456,910.88 |
|------|-------------|----------------|
| 2012 | H.P. Acthar | $141,451,607.58 |
| 2013 | H.P. Acthar | $262,581,602.41 |
| 2014 | H.P. Acthar | $391,189,652.63 |
| 2015 | H.P. Acthar | $503,999,371.37 |

90.     CMS data relating to Acthar's "total annual spending per user" for Medicare Part

D further showed dramatic increases over the same time period:

| 2011 | H.P. Acthar | $57,979.97 |
|------|-------------|------------|
| 2012 | H.P. Acthar | $89,356.67 |
| 2013 | H.P. Acthar | $108,013.82 |
| 2014 | H.P. Acthar | $133,420.75 |
| 2015 | H.P. Acthar | $162,370.93 |

91.     Thus, as the Journal of Medicine later noted in a report dated September 11, 2017,

Medicare spending on Acthar "increased 10-fold and totaled $1.3 billion from 2011 to 2015 . . . .

This spending increase was driven by a 109% increase in prescriptions per beneficiary, a 264%

increase in the number of beneficiaries prescribed [Acthar], and a 180% increase in spending per

beneficiary."[4]

92.     CMS also reported the following Medicaid spending on Acthar between 2011 and

2015:

| 2011 | H.P. Acthar | $40,007,316.65 |
|------|-------------|----------------|
| 2012 | H.P. Acthar | $57,409,698.41 |
| 2013 | H.P. Acthar | $83,938,623.82 |
| 2014 | H.P. Acthar | $126,837,119.09 |
| 2015 | H.P. Acthar | $144,565,870.89 |

---

[4] Daniel M. Hartung, PharmD, MPH, et al., "Trends and Characteristics of US Medicare Spending on Repository Corticotrophin," *JAMA Internal Medicine*, Vol. 177, No. 11, at 1680 (Nov. 2017).

93.     On November 16, 2016, Citron published a report (the "Citron Report") that analyzed and processed the CMS data, comparing it with the Company's reported sales of Acthar. The Citron Report, titled "Mallinckrodt CEO FRAUD Exposed by the new Medicare Drug Dashboard," stated that "Trudeau has been caught red handed committing securities fraud -- exposed by none other than the newly released Medicare drug- spending dashboard."

94.     The Citron Report first noted that in response "to the public outcry and pressure to search for systemic reimbursement abusers, the CMS had started to work on an online drug spending dashboard by December 2015."  The results of the CMS data, which had "just made public this week . . . . expose[] the dirty secrets of Mallinckrodt."

95.     After quoting Trudeau's statement on October 6, 2015, about the percentage of Acthar's exposure to Medicare and Medicaid, the Citron Report then stated:

> As we now learn, the concentration for Acthar paid by Medicare **has ballooned to 61% as Trudeau lied to Wall Street.**
>
> At the time, Trudeau must have calculated the investing public would never know the damning truth, but only two months later in response to public outrage, this information was on its way to being revealed to the public.
>
> For the year 2015, Medicare and Medicaid Spending is not merely "a little bit" higher than 25%. In fact, it is over **61%** of Acthar sales.
>
> (Emphasis in original.)

96.     The Citron Report detailed Acthar spending by Medicare and Medicaid from 2011 to 2015 in the following chart:

### H.P. Acthar CMS Spending

| (in millions) | <u>2011</u> | <u>2012</u> | <u>2013</u> | <u>2014</u> | <u>2015</u> |
|---|---|---|---|---|---|
| H.P. Acthar Spending by Medicare (CMS) | $49.457 | $141.452 | $262.582 | $391.190 | $503.999 |

| | | | | | |
|---|---|---|---|---|---|
| y/y growth | | 186.01% | 85.63% | 48.98% | 28.84% |
| | | | | | |
| H.P. Acthar Spending by Medicaid (CMS) | $40.007 | $57.410 | $83.939 | $126.837 | $144.566 |
| y/y growth | | 43.50% | 46.21% | 51.11% | 13.98% |
| **Total H.P. Acthar spending combined (CMS)** | **$89.464** | **$198.861** | **$346.520** | **$518.027** | **$648.565** |
| y/y growth | | 122.28% | 74.25% | 49.49% | 25.20% |
| | | | | | |
| **% of Acthar Revenue by CMS** | **41.01%** | **39.05%** | **45.51%** | **60.20%** | **61.32%** |
| **Calculated cost per beneficiary by Medicare** | **$57,980** | **$89,357** | **$108,014** | **$133,421** | **$162,371** |
| y/y growth | | 54.12% | 20.88% | 23.52% | 21.70% |
| | | | | | |
| **Calculated cost per beneficiary by Medicaid** | **$41,458** | **$44,060** | **$41,533** | **$45,331** | **$44,102** |
| y/y growth | | | | | |
| | | | | | |
| **Combined calculated cost** | **$49,210** | **$68,906** | **$77,835** | **$90,406** | **$101,624** |

97.     As the aforementioned chart in the Citron Report shows, the percentage of Mallinckrodt's Acthar sales reimbursed by Medicare and Medicaid was over 45% in 2013, over 60% in 2014, and over 61% in 2015.

98.     Each of these figures was a far cry from the 25% or "maybe a little higher" that Trudeau had provided to the market on October 6, 2015. Indeed, as the Court recognized in ruling on Defendants' motion to dismiss, Mallinckrodt's misstatement "understated Mallinckrodt's combined Medicare and Medicaid exposure for Acthar by approximately half the true amount, at best."

99.     As Citron further explained, the "long-promised, just released public information database demonstrates that HP Acthar Gel is The Single Most Expensive Drug per Treatment as reimbursed by Medicare / Medicaid," and thus made Acthar the exact kind of case on which lawmakers sought to crack down:

> President-Elect Trump has made it a promise to cut waste, fraud, and abuse from the government's healthcare reimbursement system. With Medicare's own data, Citron has now proven that Mallinckrodt is the embodiment of all three President-Elect Trump has made it a promise to cut waste, fraud, and abuse from the government's health-care reimbursement system. With Medicare's own data, Citron has now proven that Mallinckrodt is the embodiment of all three.

> When the GOP gets a grasp on the cold reality that 65% of all sales of Acthar sales go to the Federal Government, you will hear a war cry from President Elect Trump and the GOP, who have been looking to dismantle Medicare or regain the right to negotiate drug pricing.

100.    After the Citron Report was released, Mallinckrodt executives admitted Trudeau's prior figures were false and roughly double the stated estimate.

101.    On November 17, 2016, Mallinckrodt investor-relations executives, Coleman Lannum (the Company's Senior Vice President of Investor Strategy) and Daniel Speciale (Director, Investor Relations), spoke and presented slides at a Jefferies London Healthcare Conference, including a slide comparing Acthar net sales from 2013-2016. Conspicuously, not a single slide contradicted the percentages of Acthar revenues paid through Medicare and Medicaid for the years discussed in the Citron report.

102.    Following the presentation, an analyst asked Lannum to disclose the percentages of Acthar sales reimbursed by Medicare and Medicaid in response to the Citron report "basically questioning the level of reimbursement for Acthar." Lannum responded:

> So if you take a look at our core exposure of Acthar **for Medicare, it's somewhere in the mid-40s percent range.** If you **take it to**

> *Medicaid, it's probably in the mid-single digit range. Similar numbers last year*, if you go back two years, these are – by the way, these are all fiscal year numbers – we're on a September fiscal year – if you go back a couple of years, the exposure's a lot lower in Medicare. It's probably in the mid-30s. Again, with a mid-single digit, maybe a little bit higher kind of Medicaid impact.

103.    Lannum couched his answer to this question in loose terms, stating that Medicare figures were "somewhere" within a mid-40s range and Medicaid payments were "probably" in the mid- single digit range.  However, even taking Lannum's statements at face value, his admissions that Acthar's 2016 core Medicare exposure was in the "mid-40s range," Acthar's 2016 Medicaid core exposure was in the "mid-single digit range" and there "were similar numbers last year," add up to the low-50s percent range for Acthar's combined Medicare and Medicaid exposure in 2015. This is *double* the 25% or "maybe a little higher" figure Trudeau provided to investors on October 6, 2015.

104.    On November 29, 2016, Mallinckrodt released results for the fourth fiscal quarter of 2016 ended September 30, 2016, and hosted an investor call, on which Defendant Trudeau, Defendant Harbaugh, and O'Neill, as well as Dr. Romano and Lannum participated.  On the call, Trudeau stated that "Acthar contributed another strong quarter" and that the Company had seen "continued growth particularly in rheumatology, pulmonology and nephrology."  He further stated that as the Company "expand[ed] patient access in pulmonology and rheumatology, [its] patient mix has shifted more toward older patients, many of whom are covered by Medicare."

105.    In the Q&A session of the call, Chris Schott, an analyst from JP Morgan asked Defendant Trudeau, "I think you talked about a goal of reducing single product exposure to less than a third of the Company's EBITDA over time . . . So my question here is can you maybe update us one where you stand on your [Acthar] concentration . . . [?]"

106.    Defendant Trudeau responded:

So while our long-term objective is to have no single product account for more than a third of our operating income, currently our concentration has increased a bit and certainly ***Acthar now represents a significantly greater proportion of our operating income than a third***.

107.    Near the end of the earnings call, Dr. Romano then sought to clarify that:

[H]istorically the business has been partitioned roughly 30% in neurology, 30% rheumatology, 30% nephrology, and then the balance everything else, predominantly pulmonology. What we can clearly see is the percentages are growing for rheumatology, so now it's higher than 30%. The percentage of neurology is actually declining a bit and nephrology is roughly holding static, and we're seeing growth also occurring in the pulmonology business. So, that kind of gives you some perspective on the mix of business.

108.    The news of the Company's reliance on Acthar for substantially more than one-third of its total operating income revealed Mallinckrodt's exposure to Medicare and Medicaid was higher than previously indicated.

109.    The following day, on November 30, 2016, at a Piper Jaffray Healthcare conference during which Defendant Harbaugh, O'Neill and Dr. Romano participated, O'Neill stated: "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."    While O'Neill did not provide an estimate for Acthar's exposure to Medicaid reimbursements on the call, there is no reason to believe that it is not in the "mid-single digit range," as the Company previously admitted.    Thus, the figures O'Neill provided are consistent with low-50s percent range provided on the November 17, 2016 call, and materially higher than what Trudeau provided to investors on October 6, 2015.

      2.    <u>**Mallinckrodt's Misrepresentations about Acthar's Growth Prospects**</u>

110.    During the relevant period, Defendants also made numerous false and misleading statements on investor calls, press releases and earnings guidance from January 2017 to May 2017

about Acthar's long-term growth prospects that were materially false or that omitted to state material facts necessary to make their statements not misleading.

111.    On January 19, 2017, Defendant Trudeau, Lannum and Dr. Romano hosted a "Business Update" call.  On that call, Trudeau stated that Acthar was "an exceptionally durable asset" and has **"**consistently driven growth in the mid-single to low double-digit range driven predominately by volume."  He also stated that Acthar has seen "significant improvements in payer access, and now we have just under 60% of commercialized, covered under contract compared to virtually zero when we started."

112.    On February 7, 2017, Defendants reiterated this guidance of mid-single to low double-digit growth in a press release filed with the SEC as an exhibit to a Form 8-K.  The press release reported that Acthar net sales were $325.4 million, a 13.5% increase over net Acthar sales of $286.7 million in the comparable quarter in 2015.  Mallinckrodt also projected adjusted diluted earnings per share of $7.40 to $8.00 per share, and an increase of 4% to 7% for the net sales of the Specialty Brands segment, which markets Acthar.

113.    During the earnings call the same day, Trudeau stated "we've turned around the [Acthar] situation we inherited with private payers, growing from having virtually no commercial lives under contract in early 2015 to today, where just under 60% of commercially insured patient lives are covered by contract."  He added that "we've also seen growth in Acthar in the mid-single to low double digit range, driven predominately from volume increases" and that "[w]e expect these trends to continue.

114.    In the Q&A session of the call, Stephan Stewart from Goldman Sachs asked if Mallinckrodt "can [] give some more color around how that growth is trending for each, and specifically on private, how that growth has trended over the past 12 months, let's say?"

115.    In response, Trudeau stated:

> Yeah, very happy to.  Again, this is another, I think, real strength of the brand is that not only are ***we seeing good growth across the range of therapeutic area indication. We're also seeing very good growth across the payer mix.***
>
> Just to give you a little bit of perspective when we inherited Acthar, we also inherited some challenges in the commercial sector. If you recall, we had a number of payers who had made some restrictions to their formularies regarding Acthar before we took possession of the drug.  And so, between '14 and '15, we had some real work to do on the commercial side of the business and through our contracting and engagement strategy with commercial payers. We actually stabilize that situation and return the situation to growth between '15 and '16. So, now ***we've got very good growth in both commercial as well as public payers.*** And again, our mix of our payer mix of business has been relatively consistent now for quite some time certainly throughout 2016.

116.    On May 8, 2017, the Company reported that Acthar net sales for the first quarter of 2017 were $271.8 million, a 9.4% increase over $248.4 million in the comparable quarter in 2016 in a press release filed with the SEC as an exhibit to the Company's Form 8-K.  In the press release, Mallinckrodt quoted Defendant Trudeau as stating:  "[W]e continue to see strengthening in Acthar formulary positions and access for appropriate patients in both the commercial and public environments, including relaxation or removal of previous formulary restrictions and, in at least one case, addition of Acthar to a formulary for the first time."

117.    On the earnings call that day, Defendant Trudeau reiterated that, "Acthar performed well in the quarter, delivering growth within our expected long-term range of mid-single to low double digits, reflecting gains from both volume and price."   "Of particular note," Trudeau continued, "we continue to strengthen formulary positions and access to Acthar," which includes "relaxing or removing previous formulary restrictions, and in at least one case, adding Acthar to a formulary for the first time."

118.    In response to an analyst question, Trudeau further provided "that Acthar was "achieving 60% commercial lives under contract for Acthar," giving Mallinckrodt "good confidence that [it] can continue to drive the long-term growth rate expectations in the mid-single to low double- digit range."

119.    Defendant Harbaugh added that the Company's rebating strategy "was fully considered in the guidance that we provided." Lannum also stated that "[a]ll the ranges that we gave on the last call in February remain unchanged at this time."

120.    On May 19, June 6 and June 22, 2017, Mallinckrodt issued press releases in response to reports issued by short-sellers. In these releases, the Company stated that the "Company had expanded the number of commercial lives under contract from zero to nearly 60%." The Company also stated that "[i]n the commercial reimbursement space, "the majority of payers have an established pathway for the use of H.P. Acthar Gel in those patients for whom it is appropriately prescribed – those with conditions covered by the FDA-approval label and for whom the product's extensive existing data and clinical experience support H.P. Acthar Gel's use as a proven therapy." The Company further represented that the "prior-authorization and reimbursement processes used by commercial payers rely on these criteria, and are not bypassed through co-pay programs."

121.    On August 8, 2017, the Company announced its results for the second quarter ended June 30, 2017 in a press release filed as an exhibit to the Company's Form 8-K.  In the press release, the Company reiterated its EPS guidance at $7.40 to $8.00 notwithstanding that net sales were down 4.9% to $824.5 million in the quarter compared to the same quarter in 2016, and that adjusted diluted EPS in the quarter were $1.85 compared to $2.03 in the same quarter in 2016. The

Company further reported that Acthar net sales were $319.4 million in the second quarter period, a 7.1% increase over $298.3 million in the same quarter in 2016.

122.    On the earnings call that day, Trudeau stated "Acthar growth in the quarter was 7%, within our long-term range of mid-single to low double-digit."   Harbaugh also stated "Acthar once again delivered results within our expected long-term growth range of mid-single to low double digits, with net sales of $319 million, up 7%."

123.    On the call, Trudeau noted that the Company's "expectations longer term are that growth will be predominantly volume driven and we expect to see that in the back half of the year." He also stated that Mallinckrodt has been  "building on the strengthening formulary positions we reported in the first quarter and are pleased to see that new patient prescriptions have reached their highest point in the last 12 months across the majority of promoted indications as we reach a broadening base of prescribers with additional data."

124.    In response to questions from analysts, Trudeau further stated:

> In terms of the growth, *we would expect kind of a similar type growth rates regardless of the payer mix* whether it's a federal reimbursed patients, Medicare primarily, or commercial patients . . . .
>
> What gives visibility obviously and what gives us confidence is that *we continue to see good strong formulary positioning, strengthening formulary positions* that we alluded to in the first quarter . . . . One of the things that we do know is that whenever we publish new datasets on Acthar, *typically we get good volume response as a result of that and we wouldn't expect anything different here going forward*.

125.    The numerous misstatements from January 2017 to August 2017 mentioned above can be grouped into four categories.

126.    First, Defendants reiterated that Acthar was achieving growth across its commercial payer mix.

127.    Second, Defendants stated that Acthar was gaining "commercial lives" under contract and that "a majority of insurers ha[d] an established pathway" for using Acthar.

128.    Third, Defendants repeatedly stated that Acthar was strengthening its formulary positions and removing or relaxing previous formulary restrictions.

129.    Fourth, Defendants consistently maintained guidance throughout this time period for mid-single digit to low double-digit growth in net Acthar sales.

130.    These statements conveyed to the market that (a) Acthar was being included in more private insurance companies' formularies of approved medications for certain conditions and (b) insurers had expanded the circumstances under which they would approve and provide reimbursement for Acthar.

131.    At the same time Defendants and others made these statements, they were provided with historical and current formularies and restrictions on reimbursement for prescriptions written for Acthar.  This data showed many major private insurers were actually not expanding reimbursements for most of Acthar's treatments.  Rather, private insurers were cutting back on Acthar reimbursements, including approving Acthar only for a limited range of treatments, or placing severe restrictions on the duration of Acthar treatments.

132.    For instance, Aetna's Clinical Policy Bulletin ("CPB") for Repository Corticotrophin Injection (Acthar) had initially stated on August 8, 2008, that Acthar was "considered medically necessary for diagnostic testing of adrenocortical function, West syndrome (infantile spasms), and any of the FDA approved indications for repository corticotrophin after the patient has failed corticosteroid therapy."

133.    Over the years, however, Aetna had revised its CFB to cut back on the number of treatments for which it approved Acthar.

134.    On or about September 14, 2012, Aetna revised its CFB to state that Acthar (1) was not medically necessary for "diagnostic testing of adrenocortical function because it has not been proven to be superior to cosyntropin for this purpose; and (2) was "considered not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications."

135.    On or about December 9, 2014, Aetna's CPB was revised to state that Acthar was considered "experimental and investigational for dermatopolymyositis, nephrotic syndrome (including focal segmental glomerulo-sclerosis, idiopathic membranous nephropathy, IgA nephropathy, membrano-proliferative glomerulo-nephritis, and monoclonal diffuse proliferative glomerulo-nephritis), and systemic lupus erythematosus."

136.    On or about November 20, 2015, Aetna's CFB was revised to state that Acthar was "considered experimental and investigational for amyotrophic lateral sclerosis, multiple sclerosis, optic neuritis, and rheumatoid arthritis."

137.    On or about November 7, 2017, Aetna's CFB was revised to state that Acthar was "considered experimental and investigational for birdshot choroiditis, pulmonary sarcoidosis, neurosarcoidosis, and uveitis (including panuveitis and posterior uveitis)."[5]

138.    Similarly, United Healthcare revised its coverage of Acthar on September 1, 2017 to limit the drug's duration and range of treatments.  The revised policy states that Acthar is considered "proven and medically necessary" treatment for infantile spasms, but only for up to 4 weeks when certain enumerated conditions are met, and for opsoclonus-myoclonus syndrome (i.e., OMS, Kinsbourne Syndrome) when its enumerated criteria are met.

---

[5] Insurers typically exclude coverage for treatments considered to "be experimental and investigational" or "not medically necessary."

139.   The United Healthcare coverage policy further stated Acthar is not "medically necessary for treatment of acute exacerbations of multiple sclerosis" or any of the following disorders and diseases:

- Rheumatic disorders: psoriatic arthritis, rheumatoid arthritis, including juvenile rheumatoid arthritis, ankylosing spondylitis

- Collagen diseases: systemic lupus erythematosus, systemic dermatomyositis (polymyositis)

- Dermatologic diseases: severe erythema multiforme, Stevens-Johnson syndrome

- Allergic states: serum sickness

- Ophthalmic diseases: severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis, optic neuritis, chorioretinitis, anterior segment inflammation

- Respiratory diseases: symptomatic sarcoidosis

- Edematous state: to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus

- Any indication outside of the medically necessary indications above

140.   Cigna's coverage policies similarly provide that while Acthar is considered to be "medically necessary" for treatment of infantile spasms in an individual less than 2 years old, it is considered to be "not medically necessary for all other indications." Cigna's coverage policies further states:

> Current evidence does not support any definitive benefit to the use of H.P Acthar Gel over conventional corticosteroids and/or immunosuppressive therapy (including prednisone and methylprednisolone) for FDA approved indications other than treatment of infantile myoclonic seizures. H.P. Acthar Gel is clinically equivalent but not superior to conventional corticosterois and/or immunosuppressive therapy for the treatment of multiple sclerosis, rheumatic disorders, collagen diseases, dermatologic

disorders, allergic states, ophthalmic diseases, respiratory diseases, or edematous states, and is significantly more expensive. Coverage for H.P. Acthar Gel may therefore depend upon the applicable health benefit plan definition of medical necessity. Where that definition limits coverage to the most cost-effective equivalent treatment, the use of H.P. Acthar Gel for indications other than infantile myoclonic seizures is considered not medically necessary.

141.    Many Blue Cross Blue Shield entities have similarly not expanded their approvals for Acthar treatments beyond a few indications.  For example, Independence Blue Cross Blue Shield, which serves Southeastern Pennsylvania, adopted a policy on Acthar effective July 1, 2015 that has remained in place.  That coverage policy considers Acthar medically necessary to treat infantile spasms in individuals age 2 or younger, and therefore covered for 12 months. Independence Blue Cross Blue Shield policy does not consider the following other treatments of Acthar medically necessary, and thus will not approve requests for such uses:

- Multiple sclerosis

- Rheumatic disorders: psoriatic arthritis, rheumatoid arthritis, juvenile rheumatoid arthritis, ankylosing spondylitis

- Collagen disease: systemic lupus erythematosus, systemic dermatomyositis (polymyositis)

- Dermatologic disease: severe erythema multiforme, Stevens-Johnson syndrome

- Allergic states: serum sickness

- Ophthalmic diseases: keratitis, iritis, iridocyclitis, diffuse posterior uveitis, choroiditis, optic neuritis, chorioretinitis, anterior segment inflammation

- Respiratory: symptomatic sarcoidosis

- To induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus

- Corticosteroid-responsive conditions

- Diagnostic testing for adrenocortical function

- Off-label indications

142.    The Independence Blue Cross Blue Shield policy further states "[a]ll other uses for repository corticotropin (H.P. Acthar® Gel Injection) are considered experimental/investigational and, therefore, not covered because the indication is not supported as an accepted off-label use . . . ."

143.    Thus, Defendants' statements were false and highly misleading, because they failed to disclose that many major insurers were continuing to approve Acthar only for a limited range of treatments, and others were continuing to place severe restrictions on the duration of Acthar treatments, both of which created a risk that a substantial portion of the prescriptions written for Acthar would never be filled and Acthar sales could decline.

144.    The falsity of Defendants' statements in this regard finally came to light when, on November 7, 2017, the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year. Specifically, the Company disclosed that its net sales of Acthar in the third quarter ended September 29, 2017 were $308.7 million, down by 5.6% from net sales of $327.0 million during the same quarter in 2016.

145.    During the third quarter 2017 earnings call held on the same day, Defendant Trudeau admitted that "Acthar sales growth slowed in the quarter impacted by both the comparison against 2016 with an additional selling week and a volume decline." He attributed the volume decline due to the fact "an increasing number of prescriptions going unfilled beyond the level Mallinckrodt had seen previously" and continued "payer pressures."  He also said that the Company expected that fourth quarter 2017 net Acthar sales would also be down sequentially, and

that payer pressures "continue to be more challenging," as payers were expected payers "to put more and more hurdles in front of patients getting these reimbursements."

## V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.  Defendants Make Misleading Statements Regarding the Extent of Acthar Sales Reimbursed by Medicare and Medicaid

146.    On October 6, 2015, Mallinckrodt held an "update investor call," during which Defendants Trudeau, Harbaugh, Chief Medical Officer Steve Romano and Senior Vice President of Investor Strategy Cole Lannum spoke and responded to questions.

147.    Defendant Harbaugh stated on the call:

> When we evaluated the acquisition of Acthar, we dug deeply into the product, the market, existing therapies, and the potential for additional competition. We concluded then that Acthar was an unique asset with significant durability, and great potential for substantial long-term volume growth, and we continue to believe that now.

148.    Jerry Gerberry of Leerink Partners then asked: "What is your Acthar exposure to Medicare?"

149.    In response, Defendant Trudeau asserted:

> So with regards to your question on Medicare exposure to Acthar, a couple of things. One, if we look at our overall business, the ***combined proportion of our business that goes through Medicare and Medicaid combined it's about a quarter of our business, roughly. Acthar is maybe a little higher than that.*** But in general, our business is about a quarter.

150.    This statement set forth above was materially false and misleading, and omitted to state material facts, because it materially misrepresented the total percentage of Acthar sales attributable to Medicare and Medicaid reimbursements.

151.    The Citron report showed that the percentage of Acthar sales reimbursed by Medicare and Medicaid was over ***61%*** of the Company's total Acthar sales in 2015, over ***60%*** of

Questcor's and the Company's total Acthar sales in 2014, and over *45%* of Questcor's total Acthar sales in 2013.

152.     Each of these figures was materially higher than the 25% and "maybe a little higher than that" figure that Trudeau disclosed on October 6, 2015.  Indeed, Trudeau's statement misled investors into believing that Acthar's combined Medicare and Medicaid exposure was less than half than what it was.

153.     As the Court already found in denying Defendants' motion to dismiss in the Class Action, "[t]his statement was both false and material."  It was false because "it understated Mallinckrodt's combined Medicare and Medicaid exposure for Acthar by approximately half the true amount, at best."

154.     After the truth was revealed to the market more than a year later, the Company subsequently admitted, by providing revised estimates of Acthar's combined exposure to Medicare and Medicaid that the figures Trudeau previously provided were false.

155.     On November 17, 2016, Lannum stated on a conference call that Acthar's "core" 2016 Medicare exposure was "somewhere in the mid-40s percent range," that Acthar's 2016 Medicaid exposure was "probably in the mid-single digit range," and there were "[s]imilar numbers last year."  On November 30, 2016, O'Neill stated that Mallinckrodt's Medicare reimbursement for Acthar had "shifted a little bit into the mid-40s."  Thus, even taking these rough figures at face value, Acthar's combined Medicare and Medicaid exposure for 2015 would have been in the low-50 percent range.

156.     Indeed, as the Court noted in denying Defendants' motion to dismiss in the Class Action,  "the subsequent statements made by Mallinckrodt's own executives establish the falsity of the statement":

In November 2016, approximately one year after Trudeau's alleged misstatement, a senior vice president stated that around one-half of Acthar sales were reimbursed by Medicare and Medicaid during the year in question.  And another executive said that Mallinckrodt's "portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for [Acthar] versus where it was a year and a half, two years ago which was more in that low, mid-30s." If true, Acthar's exposure to Medicare and Medicaid combined would have been in the "low-50s percent range."

157.   The statement was also material because Acthar was Mallinckrodt's "largest single product," accounting for more than one-third of revenues, and an important metric and risk factor to Mallinckrodt's business, as identified in the 2014 joint proxy statement filed by Mallinckrodt and Questcor.

158.   As the Court held in denying Defendants' motion to dismiss in the Class Action:

The statement was material because Acthar was Mallinckrodt's "largest single product."  And the percentage of sales reimbursed by private insurers compared to sales reimbursed by Medicare and Medicaid was a "key metric" for investors, as evidenced by that metric being listed in the risk-factor section of the 2014 joint proxy. Id. ¶ 127 (noting in the risk- factor section that "an increase in the proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible patients and government entities" would "indicate[] that having more government reimbursements compared to private insurer reimbursements would be detrimental to the Company's business and future prospects"). Moreover, following the issuance of the Citron Report and the Company's own admissions as to Acthar's Medicare and Medicaid exposure, the price of Mallinckrodt's stock fell 18.4%.

159.   Moreover, as the Court found, a reasonable investor "surely would not have expected the actual figure to be roughly *double* the stated estimate."  This is particularly true "on an analyst call where Trudeau was presumably expected to be prepared to discuss a wide range of issues, including Acthar's Medicare and Medicaid exposure."

**B.  Defendants Mislead Investors About Acthar's Long-Term Growth Prospects**

160.    From January 19, 2017 to May 8, 2017, Defendants made numerous false and misleading statements about Acthar's long-term prospects, including statements concerning Acthar's growth across the payer mix, the strengthening of formulary positions, the relaxation or removal of previous formulary restrictions, the expansion of commercial lives under contract, and the growth levels of Acthar sales.

161.    On January 19, 2017, Defendant Trudeau, Lannum and Dr. Romano hosted a "Business Update" call.  On that call, Trudeau stated that Acthar was "an exceptionally durable asset."  He also stated:

> And we've also had significant improvements in payer access, and now *we have just under 60% of commercialized*, covered under contract compared to virtually zero when we started.
>
> *And in fact, what you've seen is that we've consistently driven growth in the mid single to low double-digit range driven predominately by volume* with pricing actions consistently very modest, consistent with our corporate pledge. And we expect that these growth trends will continue across our payer mix.

162.    On February 7, 2017, the Company filed as an exhibit to its Form 8-K with the SEC in Washington, D.C. a press release, and also held an earnings call that same day.  The press release announced results for the end of 2016 and guidance for 2017.  In the press release, Defendants reported Acthar net sales of $325.4 million, a 13.5% increase over the same quarter in 2015.  The Company also issued guidance for the upcoming year that projected adjusted diluted earnings per share ("EPS") of $7.40 to $8.00 per share, and an increase of 4% to 7% for the net sales of the Specialty Brands segment, which markets Acthar.

163.    On a February 7, 2017 earnings call, Trudeau stated:

> And through focused efforts at payer engagement, we've turned around the [Acthar] situation we inherited with private payers, growing from having virtually no commercial lives under contract

in early 2015 to today, where just under 60% of commercially insured patient lives are covered by contract. ***With these steady coverage gains in commercial plans, our overall payer mix for Acthar between private and public plans has become and stayed relatively stable.***

***With these efforts, we've also seen growth in Acthar in the mid-single to low double digit range, driven predominately from volume increases*** in both commercial and public payer plans as we expand marketing efforts into traditional on-label indications such as pulmonology and ophthalmology, and simply achieve greater reach in appropriate patient populations and key indications. ***We expect these trends to continue***.

164.    In the Q&A session of the call, Stephan Stewart from Goldman Sachs asked:

Just to follow up on Acthar payer mix, I think you guys mentioned good growth across public and private. Maybe, can you give some more color around how that growth is trending for each, and specifically on private, how that growth has trended over the past 12 months, let's say?

165.    In response, Trudeau stated:

Yeah, very happy to.  Again, this is another, I think, real strength of the brand is that not only are ***we seeing good growth across the range of therapeutic area indication. We're also seeing very good growth across the payer mix.***

Just to give you a little bit of perspective when we inherited Acthar, we also inherited some challenges in the commercial sector. If you recall, we had a number of payers who had made some restrictions to their formularies regarding Acthar before we took possession of the drug.  And so, between '14 and '15, we had some real work to do on the commercial side of the business and through our contracting and engagement strategy with commercial payers. We actually stabilize that situation and return the situation to growth between '15 and '16. So, now ***we've got very good growth in both commercial as well as public payers.*** And again, our mix of our payer mix of business has been relatively consistent now for quite some time certainly throughout 2016.

166.    On May 8, 2017, the Company filed a press release as an exhibit to its Form 8-K with the SEC in Washington, D.C. and held an earnings call the same day.  The press release

reported results for the first quarter of 2017. In the press release, the Company reported that Acthar net sales were $271.8 million, a 9.4% increase over $248.4 million in the comparable quarter in 2016. In the press release for the earnings guidance, Mallinckrodt quoted Defendant Trudeau as stating: "we continue to see strengthening in Acthar formulary positions and access for appropriate patients in both the commercial and public environments, including relaxation or removal of previous formulary restrictions and, in at least one case, addition of Acthar to a formulary for the first time."

167. On the earnings call that day, Defendant Trudeau reiterated:

> ***Acthar performed well in the quarter, delivering growth within our expected long-term range of mid-single to low double digits, reflecting gains from both volume and price.*** We're especially pleased with the progress in pulmonology and ophthalmology, our newer areas of focus.
>
> ***Of particular note, we continue to strengthen formulary positions and access to Acthar.*** Since the beginning of the year, we've made good progress with a number of payers, including a major insurer, major PBM, and a significant closed-model healthcare system to improve access to Acthar for appropriate patients in both the commercial and public environments. ***These actions include relaxing or removing previous formulary restrictions***, and in at least one case, adding Acthar to a formulary for the first time.

168. In response to an analyst question, Trudeau further provided "that Acthar was "achieving 60% commercial lives under contract for Acthar," giving Mallinckrodt "good confidence that [it] can continue to drive the long-term growth rate expectations in the mid-single to low double-digit range." He stated specifically:

> So we're very pleased, as you know, with the progress that we continue to make with regards to Acthar and its access in managed care in particular. And while our percent of commercial covered lives under contract is still in that 60% range, in this quarter we've done something which I think is significantly different. We're actually now getting stronger formulary positions across a number of payers in both the public and the commercial sector, and that

-44-

means formularies and payers that used to have restrictions on
Acthar are starting to relax those or in some cases remove them
altogether. And in this particular quarter, we actually put Acthar
onto a significant formulary for the very first time where we were
not previously able to promote into that environment. And now
given the fact that Acthar has gone onto the formulary, we're able to
promote openly across our label.

169.    On the same May 8, 2017 earnings call, Defendant Harbaugh also added that the

Company's rebating strategy "was fully considered in the guidance that we provided" with respect

to Acthar.  Finally, Lannum reiterated that Mallinckrodt is "not changing any of the rest of the

guidance information that we gave earlier this year," and thus "all the ranges that [Mallinckrodt]

gave on the last call in February remain unchanged at this time."

170.    On May 19, June 6 and June 22, 2017, Mallinckrodt issued press releases in

response to reports issued by short-sellers.  In each of these press releases, the Company stated

that it "had expanded the number of commercial lives under contract from zero to nearly 60%."

The Company also stated that "[i]n the commercial reimbursement space, "the majority of payers

have an established pathway for the use of H.P. Acthar Gel in those patients for whom it is

appropriately prescribed – those with conditions covered by the FDA-approval label and for whom

the product's extensive existing data and clinical experience support H.P. Acthar Gel's use as a

proven therapy."   The Company further represented that that the "prior-authorization and

reimbursement processes used by commercial payers rely on these criteria, and are not bypassed

through co-pay programs."

171.    On August 8, 2017, the Company filed as an exhibit to its Form 8-K with the SEC

in Washington, D.C. a press releasing announcing its results for the second quarter ended June 30,

2017, and hosted an earnings call the same day.  In the press release, the Company reiterated its

EPS guidance at $7.40 to $8.00 notwithstanding that net sales were down 4.9% to $824.5 million

in the quarter compared to the same quarter in 2016, and that adjusted diluted EPS in the quarter were $1.85 compared to $2.03 in the same quarter in 2016.  The Company further reported that Acthar net sales were $319.4 million in the second quarter period, a 7.1% increase over $298.3 million in the same quarter in 2016.

172.    On the earnings call that day, Trudeau stated:

Acthar growth in the quarter was 7%, within our long-term range of mid-single to low double-digit. We've always said the both price and volume will contribute to Acthar's performance and in this quarter price was the driver. *Our expectations longer term are that growth will be predominantly volume driven and we expect to see that in the back half of the year.* But *we've been building on the strengthening formulary positions* we reported in the first quarter and are *pleased to see that new patient prescriptions have reached their highest point in the last 12 months* across the majority of promoted indications as we reach a broadening base of prescribers with additional data.

173.    Harbaugh also stated on the call, "Acthar once again delivered results within our expected long-term growth range of mid-single to low double digits, with net sales of $319 million, up 7%."

174.    In response to questions from analysts, Trudeau further stated:

*In terms of the growth, we would expect kind of a similar type growth rates regardless of the payer mix whether it's a federal reimbursed patients, Medicare primarily, or commercial patients*, we would expect similar growth rates regardless of the type of reimbursement that occurs. In terms of specific indications, in this quarter for example, we saw really good growth in ophthalmology and pulmonology and also in infantile spasms. And so, we as you know market across a range of indications and we continue to be very optimistic about the growth of Acthar, again within that range of mid-single to low double-digit
. . . .

What gives visibility obviously and what gives us confidence is that *we continue to see good strong formulary positioning, strengthening formulary positions that we alluded to in the first quarter* . . . . One of the things that we do know is that whenever we

-46-

publish new datasets on Acthar, typically we get good volume response as a result of that and we wouldn't expect anything different here going forward.

175.    The statements set forth above in paragraphs 160 and 174 concerning Acthar's growth across the payer mix and strengthened formulary positions, the removal or relaxation of formulary restrictions and specific growth projections were false and misleading, and omitted to state material facts.   These statements misled investors into believing (1) Acthar was being included in more private insurance companies' formularies of approved medications for certain conditions; (2) insurers had expanded the circumstances under which they would approve and provide reimbursement for Acthar; and (3) Acthar's future growth would be strong.

176.    In making these statements, Defendants failed to apprise the market that many private insurers throughout 2017 had approved reimbursement for Acthar for only a few of its indications and others continued to place severe restrictions on the duration of Acthar treatments, both of which created an undisclosed risk that a substantial portion of the prescriptions written for Acthar would never be filled and Acthar sales could decline.

177.    These statements were shown to be false and misleading when Defendant Trudeau admitted on November 7, 2017, that Acthar's payer pressures were actually increasing and the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year.

178.    A review of policies of major insurers further confirms that major insurers were not expanding, but rather restricting coverage for Acthar treatments during the relevant period.

179.    For instance, Aetna had revised its policy to limit the number of treatments for Acthar it considered "medically necessary," and therefore covered under policy.   United Healthcare revised its policy to limit the duration of treatment and criteria for use of Acthar in

infantile spasms and further restricted coverage for a number of indications.  Cigna's coverage policies provided that Acthar is considered not "medically necessary" for all indications other than infantile spasms because "[c]urrent evidence does not support any definitive benefit to the use of H.P Acthar Gel over conventional corticosteroids and/or immunosuppressive therapy (including prednisone and methylprednisolone) for FDA approved indications other than treatment of infantile myoclonic seizures."  Many Blue Cross Blue Shield have similarly not expanded their approvals for Acthar treatments beyond a few indications.

180.    Thus, and as the Court found in denying Defendants' motion to dismiss in the Class Action, Mallinckrodt's statements about Acthar's growth across the payer mix and the strengthening of formulary positions were false and misleading, because "at the time the defendants made the statements, major private insurers were not expanding reimbursements for most of Acthar's treatments; rather, private insurers were cutting back on Acthar reimbursements."

181.    For example, Trudeau's statements on earnings calls that Mallinckrodt was "seeing very good growth across the payer mix" and "strengthening formulary positions" were false and misleading because the insurance company data shows that Mallinckrodt was not in fact experiencing "good growth" or "strengthening positions," and Trudeau admitted in a November 17, 2017 corrective disclosure that Acthar had experienced payer pressures.  As the Court found in denying Defendants' motion to dismiss in the Class Action:

> [A]t the time, private insurers were placing increased restrictions on Acthar's use and "had approved reimbursement for Acthar for only a few of its indications." Insurance company data allegedly shows that Mallinckrodt was not in fact experiencing "good growth" or "strengthening positions," . . . . but was instead experiencing stagnation or even contraction among major private payers. At that time, major insurers were actually placing increasing formulary restrictions on Acthar's use. Trudeau also admitted after the November 17, 2017 corrective disclosure that Acthar had experienced payer pressures and that those pressures were expected

to "continue to be more challenging." . . . Although the defendants' earlier disclosures about "payer-driven restrictions" and "payer pressures" identified the general risk factor, the defendants' representations that they were "seeing good growth across the payer mix" and were projecting "similar growth rates" across public and private payers were materially false and misleading if, as plaintiffs allege, insurers were limiting their approval policies for Acthar's use.

182.    As the Court also recognized in denying Defendants' motion to dismiss in the Class Action, "there can be little dispute that these misstatements [about growth and strengthening of formulary positions] were material."  The fact that Acthar was "realizing a contraction for private payer reimbursements and a weakening or stagnation of formulary positions would have significantly altered the total mix of information for a reasonable investor."

183.    Defendants' statements that Acthar was gaining private commercial lives in early 2017 were similarly false and misleading and omitted to state material facts, because they failed to apprise the market that many major insurers were continuing to approve Acthar only for a limited duration and range of treatments.

184.     As the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' "statements about improved access to private insured lives" were made misleading by their "failure to disclose material information about private payer restrictions."  The Court explained that the undisclosed facts about major insurers limiting the range and duration of Acthar treatments "concealed a risk that Trudeau ultimately acknowledged as a cause for Acthar's declining sales in the third quarter of 2017."

185.    Acthar's specific growth projections were materially misleading, and also omitted to state material facts about formulary restrictions for Acthar by private payers.

186.    These growth specific projections, as the Court recognized, fall into the following categories: (1) statement regarding Mallinckrodt's projection of mid-single-digit to low-double-

digit growth; (2) statements regarding earnings per share guidance, (3) statements tying Mallinckrodt's growth projections to the claim that growth would be volume-driven; and (4) statement that a rebating strategy used by Mallinckrodt for Acthar was also "fully considered in the guidance."

187.   As the Court held in denying Defendants' motion Defendants' statements about Acthar's growth prospects "led the market to believe that Acthar's future growth would be strong, but failed to disclose that Acthar's acceptance with insurers and the medical community was declining."

188.   Indeed, in denying Defendants' motion to dismiss in the Class Action, the Court recognized that Defendants "pointed to volume-driven growth as a key factor underlying their projections," and yet, "never disclosed the risk that private payer formulary restrictions could lead to reductions in Acthar sales (even in an environment where prescription levels increased)."

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

189.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

190.   Defendants Trudeau and Harbaugh acted with scienter with respect to the materially false and misleading statements, and omissions of material fact, set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made.  As the most senior executives of Mallinckrodt during the relevant period, Defendants' scienter is imputable to Mallinckrodt.

191.   During the relevant period, Defendant Trudeau was CEO of Mallinckrodt, Defendant Harbaugh served as Vice President and Chief Financial Officer of Mallinckrodt.  By virtue of their responsibilities and activities in these positions, Defendants Trudeau and Harbaugh, were privy to, and participated in, the fraudulent conduct described herein.

192.    Acthar was part of Mallinckrodt's core business because sales of the medication were a significant and material portion of Mallinckrodt's revenues.  Sales of Acthar generated more than one-third of the Company's total revenues and substantially more than that of its operating income during the relevant period.

193.    Because Mallinckrodt's sales of Acthar were part of Mallinckrodt's core business and Acthar's exposure to Medicare and Medicaid was a key metric to investors, Defendants Trudeau and Harbaugh would have had robust knowledge of significant aspects of those sales, including reimbursements from Medicare and Medicaid and Athar's long-term growth prospects.

194.    Given their high-level positions at the Company and the importance of Acthar to Mallinckrodt's business, Defendants knew, or recklessly disregarded, that the percentage of Medicare and Medicaid exposure that Trudeau reported for Acthar on the October 6, 2015 call was roughly half the actual percentage.

195.    The Company's culpability, and the culpability of each of its management team, is further evidenced by the fact that this significant misstatement was not corrected by Trudeau or by any other member of Mallinckrodt management either during the October 2015 conference or at any other time over the ensuing 13 months.  Rather, the truth about this material misstatement made by Defendant Trudeau came to light only after the CMS reported on Medicare and Medicaid spending in the years 2011 through 2015 for 80 drugs (including Acthar) that met its reporting criteria, and when Citron Research issued its report of November 16, 2016.

196.    Indeed, as the Court found in denying Defendants' motion to dismiss in the Class Action, "the question about Acthar's Medicare and Medicaid exposure on the October 2015 investor call was one that was 'readily anticipated.' . . . During the call, Trudeau made introductory statements about Acthar's contribution, and he spent significant time discussing Acthar's

competitive environment.  Also, company management was provided with up-to-date information concerning its sales of Acthar."

197.    As the Court further found in denying Defendants' motion to dismiss in the Class Action, Trudeau was – at the very least – reckless in providing and then failing to correct the severely understated percentages for Acthar's combined Medicare and Medicaid exposure on the October 6, 2015 call:

> Even if Trudeau did not know the precise figures when he made the statement, his statement and the defendants' failure to correct it was recklessness . . . . As alleged, the defendants "knew facts or had access to information suggesting that [their] public statements were materially inaccurate," . . . . and they took no corrective action following the misstatement. Yet approximately one year later, after the Citron Report was released, Mallinckrodt executives admitted that Acthar's exposure to Medicare and Medicaid was roughly double Trudeau's estimate.

198.    Prior to making the material misrepresentations described above, Defendants Trudeau and Harbaugh also knew about or recklessly disregarded the truth about Acthar's growth across the payer mix and formulary positions.

199.    Acthar's growth across the payer mix, strengthening of formulary positions, and growth projections were important metrics for Acthar, Mallinckrodt's core product.  Further, as the Court found in ruling on Defendants' motion to dismiss in the Class Action, Defendants knew that investors "would not have had sufficient information to determine that formulary restrictions were actually increasing over time" and would instead, rely on Defendants' representations.

200.    When the defendants made statements in 2017 about Acthar's growth across the payer mix, strengthening of formulary positions, and growth projections, they were well aware that private insurers were not expanding their reimbursements of Acthar, but instead were placing more restrictions on the drug.  The fact that Defendants represented to investors that formularies

were improving at the same time insurers were becoming more restrictive is evidence of their scienter.

201.    In ruling on Defendants' motion to dismiss in the Class Action, the Court found that "[t]he fact that formulary positions were not strengthening in early 2017, as the defendants repeatedly stated, is highly suggestive of at least recklessness on their behalf."

## VII.    PRESUMPTION OF RELIANCE

202.    Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Mallinckrodt common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Mallinckrodt common stock; and (e) Plaintiffs purchased Mallinckrodt common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

203.    The market for Mallinckrodt common stock was open, well-developed and efficient at all relevant times. As a result of the aforementioned materially false and misleading statements, Mallinckrodt common stock traded at artificially inflated prices during the relevant period. The artificial inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations concerning the basis for Acthar's exposure to Medicare and Medicaid, growth across the payer mix, strengthened formulary positions and the removal or relaxation of formulary restrictions, and specific growth projections.

204.    At all relevant times, the market for Mallinckrodt common stock was efficient for the following reasons, among others:  (a) Mallinckrodt filed periodic reports with the SEC; (b) Mallinckrodt common stock was listed and actively traded on the NASDAQ; (c) numerous

analysts followed Mallinckrodt; and (d) Mallinckrodt regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

205.    Plaintiffs purchased Mallinckrodt common stock in reliance on the market price of Mallinckrodt common stock, which reflected all the information in the market, including the misstatements and omissions by Defendants.

## VIII.  ACTUAL RELIANCE

206.    Prior to making the decision to purchase Mallinckrodt common stock, Plaintiffs actually and justifiably read (or heard), reviewed and relied upon (to the extent the referenced documents had been published at the time) the October 6, 2015 conference call; the January 19, 2017 analyst call; the February 7, 2017 press release, earnings guidance, and earnings call related to the Company's reported results for the end of 2016 and guidance for 2017; the May 8, 2017 earnings guidance, press release, earnings call related to the Company's reported results for the first quarter of 2017 and guidance for 2017; the May 19, June 6 and June 22, 2017 press releases in response to short sellers; and the August 8, 2017 earnings guidance and press release announcing the Company's results for the second quarter of 2017, including (as applicable):  (a) statements concerning Acthar's exposure to Medicare and Medicaid, (b) statements concerning Acthar's growth across the payer mix, (c) statements concerning Acthar's strengthened formulary positions and the removal or relaxation of formulary restrictions, and (d) statements concerning Acthar's specific growth projections.

207.    Plaintiffs actually and justifiably relied upon the information contained in October 6, 2015 conference call; the January 19, 2017 analyst call; the February 7, 2017 press release,

earnings guidance, and earnings call; the May 8, 2017 earnings guidance, press release, earnings call; the May 19, June 6 and June 22, 2017 press releases; and the August 8, 2017 earnings guidance and press release in making each purchase set forth in Exhibits A through D.

## IX.    LOSS CAUSATION

208.    As the truth about Acthar's exposure to Medicare and Medicaid, its growth across the payer mix, formulary positions, and growth projections gradually and slowly leaked into the market, the price of Mallinckrodt common stock dropped precipitously.

209.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Mallinckrodt common stock, as set forth in Exhibits A through D, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and material omissions.  Specifically, Mallinckrodt's misrepresentations concerning Acthar's exposure to Medicare and Medicaid, Acthar's growth across the payer mix, Acthar's formulary positions and the removal or relaxation of formulary restrictions, and Acthar's specific growth projections caused the price of Mallinckrodt's common stock to be artificially inflated.

210.    As a series of partial but inadequate disclosures were issued partially correcting the prior false and/or misleading statements with respect to Acthar's exposure to Medicare and Medicaid, Acthar's growth across the payer mix, Acthar's formulary positions and the removal or relaxation of formulary restrictions, and Acthar's specific growth projections – and as the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized – the price of Mallinckrodt stock declined precipitously, and Plaintiffs were damaged.

211.    On March 15, 2016, Andrew Left of Citron issued a statement on Twitter regarding the Company, noting that the market was beginning to realize that owning Mallinckrodt stock was

as risky as owning Valeant. Specifically, Left tweeted "Mkt. is starting to realize that $MNK [Mallinckrodt] equal risk to $VRX [Valeant]. Andrew Left of @Citron on CNBC 5:30 to explain risks of the $MNK platform."  Later that day, Left appeared on CNBC's *Fast Money,* and asserted that Mallinckrodt made Valeant look like a "choirboy," and "Acthar is the "poster child" of price gouging.  Left explained that "Mallinckrodt is worse than Valeant because they are dependent on one drug [Acthar], close to let's say 50 percent their EBITDA, depends on what metric you want to look at, is dependent on one particular drug. Not let's say 30 like Valeant has."  Defendant Trudeau dialed-in to *Fast Money* that day and attempted to explain the value of Mallinckrodt and how it differs from Valeant.  Trudeau stated "First and foremost, Mallinckrodt is a well-diversified, strong company. We are transparent. Our strength is both operational and financial."  He further represented that "Acthar represents less than a third of [Mallinckrodt's] business . . . ."  He reiterated that the Company has a "very strong, solid business model. Well diversified with excellent brands."

212.    The exchange was published in *CNBC* article on March 15, 2016, titled "Short Seller and Mallinckrodt CEO Go Head to Head."  Notwithstanding Defendant Trudeau's attempts to rebut Left's statements, Mallinckrodt shares dropped 20% over a two-day period, from a close of $69.61 on March 14, 2016, to a close of $55.69 per share on March 16, 2016.

213.    On November 14, 2016, CMS released updated drug pricing data from 2011 to 2015 concerning Medicare and Medicaid spending for Acthar from 2011 through 2015.  This updated information was brought to the market's attention on November 16, 2016, when Andrew Left of Citron Research published a report utilizing the data and comparing it with the Company's reported sales of Acthar.  The Citron report accused the Company and Defendant Trudeau of securities fraud in connection with Trudeau's representations that Acthar sales attributed to

Medicare and Medicaid were 25% of the Company's sales, "maybe a little higher." Contrary to Trudeau's representations, the Citron report showed that Acthar sales attributed to Medicare and Medicaid were actually over 60% and 61% in 2014 and 2015, respectively.

214. The price of Mallinckrodt common stock dropped 18.4% from November 15 to November 17, 2017 in response to these partial disclosures. At the close of trading on November 16, 2016, Mallinckrodt common stock closed at a price of $59.65 per share from the previous close of $67.80 per share. At the close of trading on November 17, 2016, Mallinckrodt common stock closed down further, dropping to $55.32 per share.

215. On November 29, 2016, before the market opened, Mallinckrodt released results for its fourth quarter 2016 and hosted a quarterly call with analysts. On that call, Chris Schott, an analyst from JP Morgan, questioned the Company's product concentration. Defendant Trudeau responded: "So while our long-term objective is to have no single product account for more than a third of our operating income, currently our concentration has increased a bit and ***certainly Acthar now represents a significantly greater proportion of our operating income than a third***." The news of the Company's reliance on Acthar for substantially more than one-third of its total operating income, which revealed that Mallinckrodt's operating income had more exposure to Medicare and Medicaid risk than investors had been previously led to believe, caused Mallinckrodt's stock price to drop 9.1% from a close of $57.67 per share on November 28, 2016 to a close of $52.42 per share on November 29, 2016.

216. However, Defendants continued to reassure investors that Acthar had improved growth across the payer mix, was strengthening formulary positions and removing or relaxing formulary restrictions, expanded the number of commercial lives under contract, and had achieved

or expected to achieve guidance throughout this time period for mid-single digit to low double digit growth in net Acthar sales.

217.     Finally, on November 7, 2017, the falsity of Defendants' statements made during 2017 concerning Acthar's claimed growth across the payer mix, strengthened formulary positions, removal or relaxation of previous formulary restrictions, and Acthar's specific growth projections came to light when the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year. Mallinckrodt's stock dropped more than 35.5% on this news, from a closing price of $31.18 on November 6, 2017, to a closing price of $20.11 on November 7, 2017.

## X.    NO SAFE HARBOR

218.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Mallinckrodt who knew that those statements were false when made.

219.    Indeed, as the Court held in denying Defendants' motion to dismiss in the Class Action, the safe-harbor does not apply to any of the false statements pleaded herein because:  (1) "much of the cautionary language presented at the beginning of the investor calls constituted standard boilerplate language lacking the necessary specificity to apprise the market of the existing risks"; (2) "cautionary statements relating to the risk that Acthar sales could be impacted by formulary acceptance and third-party reimbursement levels 'were misleading in light of historical fact[s]'; and (3) "the defendants never disclosed the risk that private payer formulary restrictions could lead to reductions in Acthar sales (even in an environment where prescription levels increased)."  Therefore, as the Court concluded in denying Defendants' motion to dismiss in the Class Action, the Company's "boilerplate warnings in Mallinckrodt's SEC filings were not adequate to protect the [Company's growth] projections from scrutiny under the PSLRA's safe-harbor provision."

## XI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

220.    Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

221.    This cause of action is brought against Defendants Mallinckrodt, Trudeau, and Harbaugh for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

222.    Defendants Mallinckrodt, Trudeau, and Harbaugh, both directly and indirectly, used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Mallinckrodt common stock; and (iii) cause the Plaintiffs to purchase

Mallinckrodt common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants Mallinckrodt, Trudeau, and Harbaugh took the actions set forth above.

223.    Defendants Mallinckrodt, Trudeau, and Harbaugh, both directly and indirectly: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Mallinckrodt common stock in an effort to artificially inflate and maintain the market prices for Mallinckrodt common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

224.    By virtue of their high-level positions at the Company, Defendants Trudeau and Harbaugh were authorized to make public statements, and made public statements, on Mallinckrodt's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

225.    In addition, Defendants Trudeau and Harbaugh had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete and accurate information.

226.    Defendants Trudeau and Harbaugh acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants

Mallinckrodt's, Trudeau's, and Harbaugh's, material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Mallinckrodt's operations, business, performance and prospects from the investing public, including concerning Acthar's exposure to Medicare and Medicaid, Acthar's growth across the payer mix, the strengthening of formulary positions, the removal of previous formulary restrictions, the expansion of commercial lives under contract, and the growth levels of Acthar sales.  By concealing these material facts from investors, Mallinckrodt, Trudeau, and Harbaugh supported the artificially inflated price of Mallinckrodt's common stock.  By concealing these material facts from investors, Mallinckrodt, Trudeau, and Harbaugh supported the artificially inflated price of Mallinckrodt's common stock.

227.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Mallinckrodt's common stock.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased Mallinckrodt common stock at artificially inflated prices.  As a series of partial but inadequate disclosures were issued – and as the foreseeable risk previously concealed by Defendants' material misstatements and omissions partially materialized – the price of Mallinckrodt securities substantially declined.

228.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to Acthar's exposure to Medicare and Medicaid, Acthar's growth across the payer mix, the

strengthening of formulary positions, the removal of previous formulary restrictions, the expansion of commercial lives under contract, and the growth levels of Acthar sales, Plaintiffs would not have purchased Mallinckrodt common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

229.    By virtue of the foregoing, Defendants Mallinckrodt, Trudeau, and Harbaugh have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

230.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's common stock.

231.    Taking into account the tolling of the limitations period by the filing of the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

### SECOND CAUSE OF ACTION
### Violations of Section 20(a) of the Exchange Act
### Against Defendants Trudeau and Harbaugh

232.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

233.    This Cause of Action is asserted against Defendants Trudeau and Harbaugh and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

234.    Each of Defendants Trudeau and Harbaugh was a controlling person of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act.

235.    By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Trudeau and Harbaugh had the power to

influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

236.    Defendants Trudeau and Harbaugh were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Trudeau and Harbaugh each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

237.    Defendants Trudeau and Harbaugh culpably participated in Mallinckrodt's violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

238.    By reason of the conduct alleged in the First Cause of Action, Mallinckrodt is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Trudeau and Harbaugh are liable pursuant to Section 20(a) based on their control of Mallinckrodt.

239.    Defendants Trudeau and Harbaugh are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Mallinckrodt common stock.

240.    Taking into account the tolling of the limitations period by the filing of the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## THIRD CAUSE OF ACTION
### Common Law Fraud
### Against All Defendants

241.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

242.    Defendants Mallinckrodt, Trudeau, and Harbaugh made, authorized, or caused the representations and/or omissions set forth above.

243.    Those representations and omissions were material.

244.    The material misrepresentations set forth above were knowingly made by Defendants Mallinckrodt, Trudeau, and Harbaugh with the intent to deceive, and Defendants Mallinckrodt, Trudeau, and Harbaugh omitted and concealed material facts from Plaintiffs.

245.    Defendants Mallinckrodt, Trudeau, and Harbaugh knew that their representations were false and/or misleading, and their omissions were material and rendered their representations misleading at the time they were made or omitted.

246.    Defendants Mallinckrodt, Trudeau, and Harbaugh knew that investors like Plaintiffs would receive and rely on such misrepresentations, and intended that their false and/or misleading statements and omissions would induce Plaintiffs to purchase Mallinckrodt common stock at inflated prices.

247.    Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions. Plaintiffs would not have purchased Mallinckrodt common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid, had they known the true facts regarding, *inter alia*, Acthar's exposure to Medicare and Medicaid, Acthar's growth across the payer mix, the strengthening of formulary positions, the

removal or relaxation of previous formulary restrictions, the expansion of commercial lives under contract, and the growth levels of Acthar sales.

248.    As a direct and proximate result of such reliance and Defendants Mallinckrodt's, Trudeau's, and Harbaugh's fraudulent misconduct, Plaintiffs have suffered damages.

249.    Moreover, based on the intentional, malicious, willful, and wanton conduct alleged herein, which indicates that Defendants Mallinckrodt, Trudeau, and Harbaugh acted with improper motive and/or vindictiveness, Plaintiffs seek punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Negligent Misrepresentation
### Against All Defendants

250.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

251.    By reason of the conduct described herein, Defendants negligently made misrepresentations and/or concealed or failed to disclose material facts about Acthar's exposure to Medicare and Medicaid and its growth prospects.

252.    In making each of the misstatements set forth herein, Defendants failed to act with the prudence required of a reasonable person in each of their respective positions, and each was otherwise careless and/or reckless in making material statements of fact to Plaintiffs to induce their investment of millions of dollars in Mallinckrodt securities.

253.    Defendants intentionally provided this information for the guidance of a limited group of persons in a particular business transaction in the course of Defendants' business and to further their pecuniary interests.

254.   Mallinckrodt and Defendants Trudeau and Harbaugh had a duty of care to and a special relationship with Plaintiffs.

255.   Plaintiffs actually read, reviewed and relied on, and were misled by Defendants' misrepresentations in making their decisions to purchase Mallinckrodt securities.  Plaintiffs' reliance was reasonable and justifiable under the circumstance, because Plaintiffs were public investors without access to nonpublic information and Plaintiffs had no reason to doubt that the Defendants were being truthful and forthcoming in making these representations.

256.   As a proximate result of these Defendants' negligent misrepresentations and omissions, Plaintiffs have been harmed in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)   Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)   Awarding Plaintiffs punitive damages for Defendants' intentional, malicious, willful, and wanton conduct as detailed above;

(c)   Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(d)   Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

The Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated: October 5, 2020 **WHITEFORD, TAYLOR & PRESTON L.L.P.**

*/s/ Jeffrey C. Seaman*
Jeffrey C. Seaman (D.C. Bar No. 466509)
111 Rockville Pike, Ste. 800
Rockville, MD 20850
Tel. 301.804.3619
jseaman@wtplaw.com

*-and-*

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick *(pro hac vice forthcoming)*
Marc B. Kramer *(pro hac vice forthcoming)*
Michael J. Hampson *(pro hac vice forthcoming)*
Jarett N. Sena *(pro hac vice forthcoming)*
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 597-2800